ALT, et al. *v.* BAILEY, STATE TAX COLLECTOR.

Division A.   May 7, 1951.

No. 37926  (52 So. (2d) 283)

548

L. B. Jones and Evelyn H. Conner, for appellants.

Jno. G. Burkett, for appellee.

**Kyle, J.**

This suit was filed by the State Tax Collector for the use and benefit of the City of Jackson against L. E. Alt and P. E. Puckett, partners, doing business under the trade name of Acme Loan Service, to recover privilege taxes and damages alleged to be due and owing to the City of Jackson by the Acme Loan Service for the privilege of engaging in the business of lending money at a greater rate of interest than 15 percent per annum. The defendants are nonresidents of the State of Mississippi, and the suit was filed as a nonresident attachment suit in the chancery court. D. L. Minor, Mrs. D. L. Minor and the Commercial Bank and Trust Company were named in the bill of complaint as garnishee-defendants.

Alt and Puckett, in this answer, admitted that they were trading in the City of Jackson as Acme Loan

Service, but denied that they were engaged in the business of lending money, or that they were charging and contracting for the payment of a greater rate of interest than 15 percent. They averred in their answer that they were engaged in the business of brokering loans for individuals, and as brokers were paid compensation for their services; that the lender with whom they placed loans for their customers was the Avoyelles Trust and Savings Bank of Bunkie, Louisiana; and that all notes executed by their customers for loans made by them were made payable to said bank in the State of Louisiana. The defendants, Alt and Puckett, further alleged in their answer that the notes executed by their customers in favor of the said bank included interest calculated at the rate of six percent per annum for the term of the loan, and the defendants denied that they were liable for the privilege tax claimed to be due and owing to the City of Jackson. The garnishee-defendants filed separate answers in which they stated that they had no funds in their hands belonging to the defendant partners; but the garnishee-defendants, D. L. Minor and Mrs. D. L. Minor, in their answer stated that they had in their possession and under their control the office supplies and equipment used in and about the business of the Acme Loan Service.

On the trial of the case before the chancellor, P. E. Puckett, one of the partners in the Acme Loan Service, having been called as an adverse witness, testified that the Acme Loan Service had been engaged in the loan brokerage business in the City of Jackson since June 1949; that the method of operating the business was as follows: When a customer came into the place of business to borrow money, he was required to sign four papers, namely, an application for the loan, an agreement designated as a "brokerage contract", a note payable to the Avoyelles Trust and Savings Bank, in Bunkie, Louisiana, and a draft drawn on that bank for the amount the customer was to get on the loan less the small charge designated as interest; that the customer then endorsed

the draft; and that the defendants cashed the draft for him, the customer thereby receiving the actual cash. Puckett testified that, after the application was recieved, the application and the personal references given by the borrower would be checked through the local credit bureau, and that as a rule it took about a day to get a report on the application. After it had been determined that the customer was entitled to credit, the customer was then required to sign the brokerage contract for the loan. He also testified that the brokerage charges on a note for $50.00 to be paid in four monthly installments would probably amount to $17.00. Puckett testified that the payments on the loan were usually made through the Acme Loan Service effice, and that the amounts received from the borrower as payments on the loan were remitted to the bank in Louisiana by the Acme Loan Service.

In the making of the loan the customer was required to sign a draft drawn on the bank in Louisiana and payable to himsel. The customer then endorsed the draft, and the Acme Loan Service cashed the draft. A customer might however, if he desired to do so, cash the draft elsewhere; but the draft was usually cashed by the Acme Loan Service.

When the borrower made payments upon the loan, such payments were made to the Acmè Loan Service, and part of the payment was remitted to the bank in Louisiana and part of it was applied on the brokerage agreement executed by the borrower to cover the charges made by the Acme Loan Service for its services in procuring the loan.

Puckett testified that the Acme Loan Service endorsed and unconditionally guaranteed the payment of the paper sent to the bank in Louisiana, and that usually the Acme Loan Service was required to take up the paper 30 days after its maturity if the note had not been paid within that period of time.

Puckett testified that from October 15, 1949 to November 21, 1949, which included 32 business days, the Acme Loan Service made loans aggregating the sum of $11,-220.00, and for that amount of money brokerage fees were charged which amounted to $4,934.00. The brokerage fees amounted to approximately 45 percent of the amount of the loans. Puckett testified further that D. L. Minor was the manager of the business of the Acme Loan Service in Jackson, that the business was carried on in a comfortable office, and that five employees were regularly engaged in carrying on the business of the Acme Loan Service in Jackson.

The complainant offered two witnesses who had obtained loans from the Acme Loan Service and who testified as to the manner in which the loans were procured.

H. D. Shearer, an employee of the City of Jackson, testified that he applied for and obtained a loan of $50.00 from the Acme Loan Service, and that he paid back $78.40 in four monthly installments. The interest and loan charges amounted to $28.40. The witness testified that it required about five minutes to get the loan; that he did not know that he was borrowing money from a bank in Louisiana; that he obtained a loan of $50.00 and signed papers to pay back $78.40 in four monthly payments. On cross-examination the witness testified that ''I signed three or four different sheets of paper and they counted me out the money.'' The witness stated that he did not know what kind of papers he signed, and could not say what they were unless he could see his own signature on the papers.

James Daniels (colored) testified that he worked at Jones & Bedwell Service Station; that he had obtained several $10.00 loans from the Acme Loan Service; that each of the loans was repaid in eight weekly installments of $2.10 each, the amount repaid on each of the $10.00 loans being $16.80. When asked how long it took him to get the money, he replied ''Just a few minutes.'' The witness stated that he did not know that he was borrow-

ing any money from a bank in Louisiana; that he signed the papers presented to him without reading them; that he got $10.00 each time and paid back $16.80. On cross-examination the witness stated that he signed an application, a brokerage contract, a note and a draft. He stated that he did not know that he signed a note payable to a Louisiana bank, or a draft drawn on a Louisiana bank, but that he got the money.

In answer to the written interrogatories propounded to L. E. Alt and P. E. Puckett prior to the date of the trial, the partners gave an account of the method of procedure followed by them in making loans, which was substantially the same as the method outlined in Puckett's oral testimony hereinabove mentioned. The partners state in answer to the interrogatories that they had no written contract with the Avoyelles Trust and Savings Bank covering the making of loans for the bank, and that the bank was not obligated in any way to accept any loan it did not care to accept. But under the arrangement made with the bank the partners guaranteed the loans made by the bank, and the brokerage charges paid by the customer included charges to cover the partners' guarantee of the payment of the notes to the lender. No securities of any kind were deposited with the bank to secure the Acme Loan Service's guarantee of the paper.

The partners, according to the answers to the interrogatories, make no loans and collect no interest; they merely negotiate loans for their customers and guarantee the payment of the loans.

J. C. Battaile, an auditor and accountant employed by the State Tax Collector, called as a witness for the complainant testified that a brokerage fee of $17.00 on a loan of $50.00 to be repaid in two months would be equivalent to interest at the rate of 204 percent per annum; that a brokerage of $28.40 on a loan of $50.00 to be repaid in two months would be equivalent to interest at the rate of 340 percent per annum; and that

a brokerage fee of $6.80 on a loan of $10.00 to be repaid over a period of eight weeks would be equivalent to interest at the rate of 880 percent per annum.

After the complainant had rested, P. E. Puckett was re-called as a witness to testify again in behalf of the partners, and was asked the question, "What services do you render the borrower for the charge you make?" Puckett stated that the Acme Loan Service, for the service charge exacted of the borrower, negotiated the loan, guaranteed the payment of the loan and transmitted the borrower's payments to the lender. Puckett also testified that the Acme Loan Service had negotiated loans in the amount of $69,081.42 up to January 31, 1950; that it had failed to collect $4,050.90, which included $2,616.85 due the bank in Louisiana and $1,434.05 brokerage charges; that its expenses through January 31, 1950 had amounted to $21,488.38. The witness also testified on cross-examination that, although the Louisiana bank had a right to reject any loan, it had never rejected a loan made by the Acme Loan Service.

Puckett also stated that he resided in Birmingham, Alabama, that his business headquarters were in Birmingham, and that the business which he conducted inBirmingham was a loan business, and not a brokerage business; that the partners had two other offices in Mississippi, and that they had five offices in Alabama; that in Alabama they made direct loans themselves to the borrower, and that their business in Alabama was not carried on as a loan brokerage business; that the loans made by them through their Mississippi offices, however, were made for the bank in Louisiana.

L. E. Alt, the other partner, testified that he lived in San Francisco, California, and had been engaged in the banking business for 30 years; that he and Puckett were partners in the loan business in Alabama and in the brokerage business in Mississippi; that he made the original arrangement with the bank in Louisiana to handle the notes taken by the brokerage firm in Missis-

sippi; and that in making the arrangement with the bank in Louisiana he gave the bank financial references on himself and Puckett. Alt testified that he had an office with Puckett in Birmingham, and that he also had an office in California.

On cross-examination Alt was asked this question: "You are a very solvent man and thoroughly responsible, are you not?" The witness answered, "Some people think so."

The court asked the witness the question: "Does the bank out there (the bank in Bunkie, La.) send its money over here to you, like one of these witnesses on the stand said, without any sort of understanding or security for that money?" The witness answered: "Our endorsement is on the back of each note, Acme Loan Service. That is now owned by Mr. Puckett and myself." Alt then stated that the partners had no securities of any kind pledged to the bank to secure the notes of their customers. The court then asked the following questions and received the following answers: "Q. Then is it your credit rating in the business world that makes you a good customer, or security, for that bank over there in lending its money? A. Yes, I would assume that is so. Q. Well, is it anything else but that, and if it isn't that, what is it, as it makes them turn out the money on your endorsement? A. I would say that was it."

The chancellor found that the business in which the Acme Loan Service was engaged was in no real sense a brokerage business, and that the "brokerage" pretense was a subterfuge. The chancellor found that the partners were engaged in a money-lending business in which a greater rate of interest than 15 percent per annum was charged, and that the partners were liable for the payment of the annual privilege tax sued for for the year beginning June 1, 1949.

We think that the findings of the chancellor are amply supported by the testimony. In fact, the only reasonable

conclusion that can be drawn from the testimony in the record is that the appellants were engaged in a money-lending business where a greater rate of interest than 15 percent per annum was charged, and that the claim they were carrying on a brokerage business was a mere subterfuge for the purpose of enabling them to collect interest at a greater rate than 15 percent per annum. The principles of law governing cases of usury are therefore applicable, and ▉▉ the court in determining the question whether the appellants were actually engaged in lending money at usurious rates of interest had a right to look through the forms which the transactions were made to assume and to base its decision upon the real facts. Parchman v. McKinney, 12 Smedes & M. 631; McLaurin v. Parker, 24 Miss. 509; Hiller v. Ellis, 72 Miss. 701, 18 So. 95, 41 L. R. A. 707; Brown v. West, 80 Miss. 764, 32 So. 52; 66 C. J., Section 299, page 305; Kennedy v. Porter, 176 Miss. 742, 170 So. 286.

The proof shows convincingly that the appellants were engaged in the small loan business in the City of Jackson. As stated in appellants' advertisement, "In most cases the loan is arranged in a few minutes." So far as the borrower was concerned, all that he had to do was to sign the three or four papers which were presented to him for his signature. The money was then counted out to him in the Acme Loan Service office in Jackson. He had nothing to do with sending the draft to the bank in Louisiana, where the appellants had made their own arrangements to get the money. When he repaid the loan, together with the "brokerage charge" and interest, he repaid the same to the appellants' cashier in the same office in Jackson. The fact that the appellants obtained the funds which they loaned to their customers from the bank in Bunkie, Louisiana, upon notes of their customers bearing their own unqualified endorsement, instead of upon notes signed by the appellants as makers, did not change the nature of the appellants' business in any way.

This case is clearly distinguishable from the case of Tower Underwriters, Inc., v. Lott, Miss., 49 So. (2d) 704. In the Tower case the loans were actually made in Bogalusa, Louisiana. When the borrower signed the papers in the office of the Tower Underwriters, Inc., at Greenwood, all he received was a draft on the Louisiana Loan Discount Corporation. The borrower was then required to forward the draft to Bogalusa, Louisiana, for payment, and the draft was paid by the Louisiana Loan Discount Corporation at Bogalusa. In the case we now have before us, the borrower signed the draft and received the money in the offices of the Acme Loan Service in Jackson. The loan, as far as he was concerned, was actually completed in Jackson. In the Tower case the president of the Tower Underwriters, Inc., testified that the Tower Underwriters, Inc., was not able to make the loans itself, that the loans made by Tower Underwriters, Inc., as brokers, amounted to approximately one and one half million dollars a year and that the Tower Underwriters, Inc., did not have the money to lend. In the case that we now have before us the partners testified that it was their own credit rating which enabled them to obtain the funds which they loaned from the bank in Bunkie, Louisiana. The partners admitted that they were engaged in the money-lending business generally in the State of Alabama, and that they made loans directly to their customers in the State of Alabama where their principal offices were located.

In 55 Am. Jur. Par. 16, p. 334, in discussing the payment of commissions to intermediaries, the writer says: "And where the actual lender, in order to evade the statute, pretends to act as an agent or broker and exacts a commission for his supposed service in procuring the loan from a third person, the court, upon proof of the deceptive character of the transaction, will declare it usurious. ██ ██ The fact that a borrower is required or induced to go through the form of employing an agent who is in reality acting for the lender, or even to execute

an instrument in connection with the loan, containing an allegation that the intermediary through whom it is negotiated is his agent, will not alter the case, so as to prevent the payment of a commission to him from constituting usury.''

In the case of State v. Abbott Loan Service, Tex. Civ. App., 195 S. W. (2d) 416, 419, the court had under consideration practically the same question that we now have before us, and the facts in that case were very similar to the facts disclosed by the record in this case. In that case the court said: ''While it is the settled law in this state that an agent or a broker may lawfully charge a commission for his services in negotiating a loan with a third party and that, where the commission is charged in good faith and is not made as a cloak to avoid the usury law, such commission will not be taken into consideration in determining whether or not the loan is usurious, it must appear that the extra charge was made in good faith for so negotiating the loan and such a charge may not be made where the party charging the commission is merely lending his own money. Greever v. Persky, 140 Tex. 64, 165 S. W. (2d) 709.''

We think that the evidence is sufficient to justify the finding of the chancellor that the appellants were engaged in the business of lending money in Mississippi at a greater rate of interest than 15 percent per annum, and that the decree of the lower court should be affirmed.

Affirmed.