GENERAL CONTRACT CORP., et al. *v.* MRS. THOMAS L. BAILEY, STATE TAX COLLECTOR.

October 26, 1953

No. 39049 40 Adv. S. 10 67 So. 2d 485

486

*Harold Cox,* Jackson, for appellants.

488

*Pyles & Tucker,* Jackson, for appellee.

490

492

ETHRIDGE, J.

This is another suit involving a claim for a municipal privilege tax and penalty upon persons doing a money-

lending business where a greater rate of interest than 15 per cent per annum is charged, alleging that appellants, defendants below, are so liable. However, this appeal involves a number of other incidental questions.

Appellee, Mrs. Thomas L. Bailey, State Tax Collector, filed a bill of complaint in the Chancery Court of the First Judicial District of Hinds County against General Contract Corporation (sometimes hereinafter referred to as GCC), appellant, and five attachment defendants, who were claimed to owe money to GCC. The suit was brought by appellee in her official capacity as an officer of the State of Mississippi and for and on behalf of the City of Jackson. The bill charged that GCC, a Missouri corporation, acting by itself and through corporate subsidiaries, for four years since January 1, 1949, had been making loans of money in the City of Jackson at a greater rate of interest than 15 per cent per annum; that GCC and its subsidiaries were in effect one and the same concern, and that GCC and its subsidiary corporation, General Contract Purchase Corporation (sometimes hereinafter referred to as GCPC) had pretended to be loan brokers but were in fact lending money at an interest rate in excess of 15 per cent per annum. The bill sought to recover municipal privilege taxes for the City of Jackson for four years from January 1, 1949, to January 1, 1953, under the provisions of Section 132 of the Local Privilege Tax Act of 1944, Miss. Laws 1944, Chapter 137, being Miss. Code 1942, Section 9696-135. That municipal tax is as follows:

"*Money lenders who charge more than fifteen per cent.* Upon each person doing a money lending business where a greater rate of interest than fifteen per cent (15%) per annum is charged, whether the loan is secured or unsecured, or whether by taking bills, of sale, absolute or conditional ................................................................................ $2,000.00."

Code of 1942, Section 9696-206, imposes a penalty of 50 per cent for failure to pay the tax prior to commenc-

ing business. Hence the bill asked for a judgment for $12,000.00 in delinquent taxes and penalties plus interest. The final decree on March 31, 1953, held for appellee-complainant.

## I.

On September 3, 1952, appellant GCC filed a petition in the U. S. District Court, Southern District of Mississippi, Jackson Division, for removal of this cause on the grounds of diversity of citizenship between the City of Jackson and appellant. After removal and before a remand, the Distirct Court discharged the attachment defendants upon GCC making a bond in the amount sued for. On October 2, 1952, the Federal District Court remanded the case back to the Chancery Court. Appellants first contend that the District Court erred in remanding the cause; that the City is the real party in interest as complainant, which gives diverse citizenship; that the District Court is vested with exclusive jurisdiction by reason of the removal, and that the State court lacked any jurisdiction upon the improper remand to it. Appellants rely upon Montgomery & Atlanta Motor Freight Lines, Inc. v. Morris, 193 Miss. 211, 7 So. 2d 826 (1942), to support their argument that this Court, if it found error in the order of remand, could remand the case to the Chancery Court for removal again to the Federal District Court. There is doubt as to whether such a power exists under the present federal judicial code. 1 Barron & Holtzoff, Federal Practice and Procedure (1950), Sec. 109, Supp.; 28 U. S. C. A., Sec. 1447(c); 45 Am. Jur., Removal of Causes, Sec. 196, 204, 226.

However, we do not pass upon that question, since, assuming the existence of that power, we do not think that the requisite diversity of citizenship existed for such removal. ▮▮ A state cannot be a citizen of any state, and accordingly a suit between a state and citizens of different states cannot be removed from a state to a federal court on the ground of diverse citizenship. 45 Am. Jur.,

Removal of Causes, Sec. 58. Appellants say that the State is only a nominal party in interest and that the only real party in interest to this suit is the City of Jackson, which if true would result in the requisite diversity of citizenship. ▮▮▮ But that position fails to take account of several important factors. A portion of the delinquent taxes collected will go to the State Treasury, and to help pay for certain essential governmental functions of the State. Code 1942, Section 9192, provides that the salary of the State Tax Collector, $5,000.00 per annum, shall be paid out of funds collected by him; that the Collector shall pay the expenses incident to his office, including all attorneys' fees, bookkeeper, clerk and secretarial hire, and all his deputies, out of the funds collected, but the total amount paid out for such purposes shall not exceed 20 per cent of the total amount collected by his office. The State Tax Collector "shall retain twenty per centum of all amounts collected and paid over by him," and out of that twenty per cent he must pay the salaries and expenses of his office and "the residue shall be covered into the state treasury to the credit of the general fund." Code Section 9195 provides that the Collector shall not deduct any fees from funds collected from the state or a subdivision, but that exception is not applicable here. Under Code Section 9696-206 the Collector is given the power to collect the instant tax. Accordingly this suit by the Collector is in fact a suit for the benefit of the State as well as of the City, and with the State as a real party in interest.

In Robertson v. Jordan River Lbr. Co. and Robertson v. Wolf River Lbr. Co., 269 Fed. 606 (CCA 5th 1921), the state revenue agent of Mississippi filed suits against two lumber companies seeking to remove clouds on certain sixteenth section school lands. The state sued as trustee for the use and benefit of the inhabitants of the township. It was held that the state as the holder of the legal title of these lands in trust for a class of beneficiaries

was not a mere nominal party, but a real party in interest. In Indiana for Use of Delaware County v. Alleghany Oil Co., 85 Fed. 870 (CC Ind., 1898), the state sued for the statutory penalty for defendant's violation of the oil and gas conservation statutes. An Indiana statute provided that the penalty when collected shall be paid to the county, but the court held that there was no diverse citizenship, since the state was a real party in interest, seeking to enforce an important governmental policy of conservation of natural resources. The county under the statute was only the beneficiary of the state's bounty which could be withdrawn at any time. See also Southern Ry. Co. v. State, 165 Ind. 613, 75 N. E. 272 (1905); Anno., 147 A. L. R. 794.

In the present action the state through its officer is seeking to enforce an important governmental policy, its interest in the state's revenue system, and in taxing and penalizing those charging an excessive rate of interest. This fact, although not controlling here, is an important consideration. And under the quoted statutes the state has a substantial interest in the proceeds of any taxes collected. Hence the chancery court had jurisdiction.

## II.

Appellants further contend that the trial court erred in admitting into evidence the ordinance of the City of Jackson of August 1, 1946. The statute in effect at that time provided that "the governing body of the municipality may, by general ordinance, or by resolution, adopt this privilege tax code, and the approval of such ordinance or resolution shall constitute the privilege tax code of the county or municipality, such general ordinance or resolution must tax all privileges set forth in this act, but may prescribe any percentage of the entire code herein set forth from one hundred per cent (100%) or less, to be levied and collected in such counties or municipalities." Miss. Laws 1944, Chapter 137, Section 231,

page 223. Miss. Laws 1952, Chapter 419, Sec. 1, has since made the local taxes mandatory.

The 1946 ordinance stated in part: "That on each privilege exercised within this city for which a municipal privilege license tax is authorized by the laws of the State of Mississippi, the City of Jackson hereby levies a privilege license tax on each such privilege in the maximum amount authorized by the laws of the State of Mississippi." The balance of the ordinance provided for the issuance of yearly licenses, the method of payment, method of collection, and exemptions. Appellants say that this ordinance is ineffective to adopt the Local Privilege Tax Act of 1944, Chapter 137, Miss. Laws 1944, because it does not expressly refer to Chapter 137; that the statutory method of adoption by a municipality of such privilege taxes must be strictly followed; and that the ordinance contains nothing which would lead the average taxpayer to the 1944 laws and an identification of these privilege taxes. However, the statute required adoption of local privilege taxes by a "general ordinance or by resolution," and the ordinance in question expressly adopts and levies all municipal privilege taxes "authorized by the laws of the State of Mississippi." That is sufficient.

### III.

The privilege taxes recovered include those from January 1, 1949, to January 1, 1953, four years. General Contract Purchase Corporation engaged in the alleged brokerage business in Mississippi from January 1, 1949, to March 31, 1952. From January 1, 1949, to November 21, 1950, approximately 99 per cent of the stock of the GCPC was owned by Industrial Bancshares Corporation, and on the latter date Industrial Bancshares Corporation, a Missouri corporation, changed its name to General Contract Corporation, which took over all of the assets and property of Industrial Bancshares Corporation. From November 21, 1950, to March 31, 1952, GCPC continued

to do business in Mississippi as a subsidiary of GCC. On April 1, 1952, GCPC ceased doing business in Mississippi and withdrew from the state, and on that date appellant GCC started doing business in Mississippi and continued through the taxable period in question, ending December 31, 1952.

GCC took over the property and the office of its subsidiary GCPC when GCC took over the business of its subsidiary on April 1, 1952. By an instrument dated December 21, 1951, and filed in the office of the Secretary of State of Mississippi in January 1952, GCPC and GCC entered into a contract which provided in part that "GCC hereby assumes all the liabilities and agrees to pay all obligations of GCPC." By this contract GCC expressly assumed and agreed to pay all of the liabilities and obligations of its subsidiary GCPC, which was withdrawing from the state. ▮▮▮ Code Section 9746 provides that every lawful tax of a municipality "is a debt due by the person or corporation * * * and may be recovered by action." This provision applies to the instant tax. ▮▮▮ Moreover, these privilege taxes in the absence of statute are liabilities and obligations of GCPC which were assumed by GCC. Code Sections 5347-5349 provide for the method of withdrawal from the state by a foreign corporation. Under Section 5348 the withdrawing corporation must file a sworn statement reciting in part that it owes no debts or demands liquidated or unliquidated. Section 5349 provides that the filing of the required instrument shall entitle the foreign corporation to withdraw from this state, "but that said withdrawal shall in nowise nor in any manner affect any claim, suit, or demand, either liquidated or unliquidated, of any nature of the state of Mississippi or any political subdivision thereof or of any person, firm, corporation, or copartnership, arising out of the fact that the corporation desiring to withdraw from business in this state transacted business therein,

provided action is taken within the time limit allowed by statute; * * *."

These statutes and the contract whereby GCC expressly assumed the liabilities and obligations of its predecessor GCPC warrant the decree holding appellant GCC liable for privilege taxes for the entire four years in question.

## IV.

Appellant GCC asserts that it is exempt from liability for the municipal privilege tax on the business of loaning money at a rate of interest in excess of 15 per cent, Code Section 9696-135, because it paid the finance company's state-wide privilege tax levied by Mississippi Laws 1940, Chapter 110, Code 1942, Sections 9341-9351. That tax is an annual state-wide privilege tax upon every person or corporation doing a business of lending money secured by mortgages, retained-title or purchase contracts on motor vehicles, furniture, etc., or doing a business of purchasing notes secured by liens of that type. The tax is computed on the basis of one-fourth of one per cent of the total amount of indebtedness. Its administration is placed in the State Tax Commission, and the amounts paid by the taxpayer under it are credited upon his income tax for that calendar or fiscal year. Section 9344 provides with reference to this finance company's tax that "the tax hereby levied is in lieu of all other privilege taxes upon such business * * *." Accordingly appellants argue that having paid this tax for the four years in question, totaling $45,525.03, appellant is exempt from the local privilege tax here sought to be collected.

However, the finance company's tax is placed upon an entirely different taxable incident than is the municipal privilege tax of Section 9696-135. The state-wide finance company's tax is upon the business of lending money secured by mortgages on personal property or by acquiring notes so secured. The exemption stated in that statute is simply in lieu of all other privilege taxes "upon

*such* business.'' On the other hand, the tax here levied under Section 9696-135 is a municipal privilege tax upon persons doing a money lending business where a greater rate of interest than 15 per cent is charged ''whether the loan is secured or unsecured.'' The Legislature there authorized a special city privilege tax upon a particular type of lender which is loaning money at an excessive, usurious rate of interest. This is further illustrated by the fact that Section 9696-134 authorizes a municipal privilege tax on the business of lending money on personal or other securities, and presumably a taxpayer who paid the state-wide finance company's tax would be exempt from that particular municipal tax. Moreover, Section 9696-209, in the local privilege tax act, expressly provides: ''All privilege taxes levied and imposed by this act shall be paid in addition to any and all other taxes, and any person pursuing or engaging in more, than one of the businesses for which a privilege tax is imposed, shall pay separately the privilege tax imposed upon each separate business so conducted, engaged in, or pursued except as otherwise specifically provided by this act, * * *.''

In this connection appellant relies also upon Section 9696-231: ''The privileges taxed by this act shall not be subject to taxation for a greater extent than is permitted by the sections of this act, either by the board of supervisors of any county or by any municipality, and no municipality or county shall levy any tax on any privilege which has been duly licensed for state-wide purposes.'' But the prohibition in the last clause is limited to the taxing of a privilege which has already been duly licensed for state-wide purposes. And the finance company's tax is on the privilege of lending money secured by mortgages on personal property, and not on the privilege of lending money at a greater rate of interest than 15 per cent whether secured or unsecured. The record in the instant case reflects that GCC and GCPC made a sub-

stantial number of unsecured loans as well as secured. However, we do not place our decision on that fact, since we are of the opinion that the finance company's tax is upon an entirely different taxable incident from that imposed in Section 9696-135. Hence the fact that appellant GCC and GCPC paid the finance company's tax does not exempt it from the local privilege tax in question.

## V.

Appellant argues that the final decree is against the great weight of the evidence, in the finding that brokerage fees charged by GCPC and GCC `and the interest charged by the St. Louis banks were both in fact interest, and charges for the use of money, at an aggregate rate of interest in excess of 15 per cent per annum. GCC and its predecessor Industrial Bancshares Corporation owned approximately 99 per cent of the stock in GCPC during its operations in Mississippi from January 1, 1949, to March 31, 1952. On the next day GCC qualified to do the same business in Mississippi, and it continued to do so through the taxable period. From January 1, 1949, to July 30, 1950, GCPC handled all of the so-called brokerage loans with the Northwestern National Bank in St. Louis. From July 30, 1950, to the date of its withdrawal from the state on April 1, 1952, GCPC handled all such loans with the Bank of St. Louis. And from the latter date through the taxable period ending December 31, 1952, GCC, which took over the business and assets of its subsidiary in Mississippi, continued to handle all of the so-called brokerage loans with the Bank of St. Louis.

During the taxable period in question the Northwestern National Bank and the Bank of St. Louis were subsidiaries of Industrial Bancshares Corporation, the predecessor of GCC, and later of GCC. GCC and its predecessor Industrial Bancshares Corporation owned 99.60 per cent of the capital stock of the Bank of St. Louis, and 89.7 per cent of the capital stock of the Northwestern

National Bank, both of St. Louis. In other words, from January 1, 1949, to March 31, 1952, GCPC allegedly brokered loans with first the Northwestern National Bank in St. Louis, and later with the Bank of St. Louis, in St. Louis, both of which were substantially owned and were controlled by GCC, which also owned all of the stock in GCPC. After GCC came into this state, April 1, 1952, GCC allegedly brokered its loans with the Bank of St. Louis, in St. Louis. The officers of these corporations were substantially the same, and their offices in St. Louis were located in the same building. These factors of interlocking ownerships are relevant and important evidence on the issue of whether the particular transactions in question were in fact loans made by GCC and GCPC, or whether the loans were made out of the state and the in-state corporations simply charged legitimate brokerage fees.

A brief summary of the loan procedure is as follows: GCPC and later GCC had offices in the City of Jackson. A prospective borrower would come to their office and fill out a personal statement and application for a loan, which averaged about $348.00. The application would give personal details about applicant and his financial condition. The application would recite, for example, that whereas the applicant was applying to the Bank of St. Louis for a loan through GCC "as my agent and broker," and the applicant had executed a note for the purpose of being submitted to the lender, in consideration of GCC's service as a broker in submitting the application, note and other papers, and in consideration of GCC's unconditional endorsement of the note and its agreement to remit for applicant any payments on it, applicant agreed to pay GCC a stated brokerage fee. GCC would then make some credit investigation of the borrower which apparently took one or two days. The borrower would then make his second trip to GCC's office, on which occasion he would sign a note and usu-

ally a deed of trust securing the note with personal property as collateral. There were also a substantial number of unsecured notes, with co-makers. The note was for the total amount of the loan, plus brokerage fee, life insurance, and interest for the period of the loan. The note recited that interest would run at 6 per cent per annum after maturity; that the loan is being negotiated and closed and is payable in St. Louis, Missouri; that the rights of the parties shall be measured by the laws of the State of Missouri. The payee in the note would be the St. Louis bank.

The borrowers would also execute a chattel mortgage with the Bank of St. Louis, for example, as beneficiary, covering personal property within Mississippi. The borrowers would execute a draft printed on the back of an envelope. The draft was made payable to the borrower, drawn by the borrower on the Bank of St. Louis in St. Louis, Missouri, and endorsed by the borrower in blank. The draft was for the total proceeds which the borrower received, plus brokerage fee retained or received by GCC, life insurance premium, and interest. The other loan papers would then be placed in the draft-envelope. GCC almost always cashed the draft for the borrower, who got his money less brokerage fee at the time of this second visit to GCC. Appellant's witnesses testified that this was done as a convenience to the borrower, that he could cash the draft any place he wanted to, but it is manifest that in every instance the borrower cashed his draft at the local office of GCC, or GCPC. The St. Louis bank received 5 per cent per annum, included in the amount of the note, and the alleged broker received a fee of 7.25 per cent of the face amount of the note. The interest and the so-called brokerage fee computed together exceeded 15 per cent per annum.

GCPC and later GCC assisted in the collection of the loans made. In almost every instance they would remit the payments to the St. Louis banks for the local bor-

rower, although the borrower had the right to send them direct. The bank would furnish the borrower with a ''payment coupon book'' outlining in coupons the installment payments. GCC and GCPC kept duplicate records of the accounts of the borrowers and kept currently informed on the status of each account. They would write collection letters to the borrowers when they became delinquent.

Prior to September 1, 1951, applications of borrowers for loans were not submitted to the bank in St. Louis for its prior approval. During that period a witness for appellant stated that GCPC had certain standards under which it could make loans, which were prescribed by the St. Louis bank, and that GCPC would approve the loan itself if it complied with the standards prescribed by the St. Louis bank. We are not given any indication of what those standards were. After September 1, 1951, witnesses for appellant testified that appellant and GCPC would first submit the application to the lender, the Bank of St. Louis, for approval; that there were three methods of doing this, by mail, telephone or wire, and that the normal period between the date of application and the borrower getting his money ran from 24 to 36 hours. The Bank of St. Louis would then wire back its approval. It was testified that the Bank of St. Louis would reject from 8 to 10 per cent of the applications. The record does not indicate what information the so-called broker would furnish the Bank of St. Louis, when it submitted by telegraph, telephone or mail the application for loan. A reasonable inference from the entire record is that the submission of applications was primarily formal and desultory.

The chancery court concluded that in fact the pretended brokers and lenders were one and the same person; that all brokerage charges made by the pretended brokers and all interest charges made by the pretended lenders inured to the benefit of the same person; that

both the brokerage fees and interest charged and collected must be considered as interest, which was at a rate of interest greater than 15 per cent per annum. The final decree found that the GCPC and GCC had been engaged in the business of lending money in the City of Jackson; that they had not paid the municipal privilege tax, and that GCC was liable for the same with interest; that the corporations involved were for all practical purposes so closely connected and operated as to be one single financial unit. Hence judgment was rendered against appellant GCC for $12,000.00 plus interest thereon from the respective dates when the same became due and payable.

The decree of the chancery court is amply supported by the evidence. There have been a number of cases in recent years considering whether an alleged brokerage fee is in fact that, or whether it constitutes interest or a charge for the use of money. Many of these cases have apparent inconsistencies, but considered as an entirety, the real question decided in all of them is one of good faith and substance. Are the two parties acting separately, one merely lending money and the other merely bringing lender and the borrower together? Or are they acting jointly (either as principal and agent or as co-partners in effect) to lend money and to receive compensation for it in excess of the legal rate of interest? In answering these questions, there are a number of factors and points of distinction which may be considered. One factor is whether the so-called broker endorses or guarantees the loans made by the so-called lender. In the instant case no such endorsement or guaranty was given by GCPC or GCC, although the brokerage contract with the borrower stated that the so-called broker was doing so. The value of this fact varies according to the circumstances. Tower Underwriters, Inc. v. Lott, 210 Miss. 389, 49 So. 2d 704 (1951); Alt v. Bailey, 211 Miss. 547, 52 So. 2d 283 (1951).

Another factor is whether the lender is out of the state or within the state, but this does not constitute any valid distinction, except insofar as it may be relevant to the relationships between the parties. One element in a proper case may be of considerable weight, namely, whether the lender and the broker are affiliated by interlocking ownerships, such as through corporate directors, stockholders or partnerships. If there is a bona fide brokerage arrangement existing, the mere fact of affiliation alone should not invalidate the respective positions of the lender, but this criterion is of some value in ascertaining the good faith and the true factual relationships of the parties. For example in Gulley, S. T. C. v. Gulf Coast Industrial Loan Co., 168 Miss. 768, 151 So. 754 (1934), the tax collector brought suit to collect back ad valorem taxes against the loan company. The latter claimed an exemption under the statute exempting all notes bearing a rate of interest not greater than 6 per cent. There were two corporations involved, appellee and the Gulfport Loan and Brokerage Company. There was a written contract between them, by which appellee agreed to loan money to borrowers obtained by the brokerage company, which would guarantee payment of the notes. The brokerage company furnished a place of business for appellee and paid salaries of appellee's employees. Appellee was under no obligation to accept a particular loan unless approved. A director of appellee was treasurer of the brokerage company, and all the officers of the brokerage company were stockholders in appellee. Stockholders in the brokerage company were stockholders in appellee, although the reverse was not true. The court denied the tax exemption, and held that the so-called brokerage fee was in fact part of the interest charged:

"The question is, What does the relationship existing between appellee, the brokerage company, and the borrower, as shown by the record, necessarily mean? We

think only one reasonable conclusion can be drawn therefrom, and that is that it constitutes a scheme on the part of appellee company to avoid the payment of taxes— an effort to bring itself within the statute exempting from taxation money lent at not more than six per cent per annum. * * *

"If a broker is really an agent of the lender, the lender cannot legally require the borrower to pay the full legal rate of interest, and, in addition, compensation to the lender's agent, and where the broker is the regularly employed agent of the lender, the act of the borrower in signing an application for a loan, in which he authorizes the broker to act as his agent, will not prevent the broker's exaction of a commission from the borrower being usurious. * * *

"We think the record in this case means, and means nothing else, that appellee and the brokerage company in the conduct of their business are one and the same thing; that the compensation, whether in the form of interest or for brokerage service, is for the benefit of both; and that the pretended investigation certificate for the benefit of the borrower attached at the bottom of the note is part of a mere subterfuge for the purpose of evading taxes, and that neither the borrower nor the appellee is expected to comply with the terms set out in it.''

In the present case the appellant GCC owned substantially all of the stock of the St. Louis banks and of GCPC when the latter was operating in the state. The trial court was warranted in giving this fact considerable weight under the present circumstances. The quoted statements above are applicable here.

The actual contract and the methods of operation between the so-called broker and lender are of course entitled to considerable, if not primary, weight. Here there was no written contract between the corporations. For a part of the period in question the St. Louis bank made

no type of prior approval of the loans. The loans were made, and the papers then sent to the out-of-state bank. For the latter part of the taxable period in question, the approval of loans by the lender by telegram, telephone and letter, was of doubtful significance, and apparently purely formal in most instances. No telegrams or letters submitting such loans were introduced by appellants into the record. The fact that the local so-called broker did not endorse the paper is of no particular significance here, since the joint ownership and control of the corporations, with substantially the same corporate officers for all, would have rendered such guaranty a superficial procedure.

Another factor entitled to considerable weight is of course the practical method of handling the loan with the borrower, including how, when and where he gets his money and repays the same. In the present instance, he received his money at the local office of GCC or GCPC, and the loan was in fact closed and completed in Mississippi. The borrower repaid the loan at the local office, although theoretically he had the right to repay it at the St. Louis bank. Moreover, the so-called broker followed the usual collection procedures of a lender in trying to keep the loan current and in undertaking to collect the same. So far as the borrower was concerned, except for the formal stipulations and the papers which he signed, he was in fact borrowing from GCPC or GCC.

In Tower Underwriters, Inc. v. Lott, 210 Miss. 389, 49 So. 2d 704 (1951), the court upheld a bona fide brokerage agreement. The broker endorsed paper. There was no common ownership between the out-of-state lender and the broker. To the same effect is Abraham v. Friendly Finance Co. of Biloxi, 38 So. 2d 323 (Miss. 1949). Gulley, S. T. C. v. Gulf Coast Industrial Loan Co., discussed above, is substantially similar to the present case. There the court considered the factual and interlocking relationships of the parties and held the so-called brokerage

fee to be interest. In Alt v. Bailey, S. T. C., 211 Miss. 547, 52 So. 2d 283 (1951), a decree for the tax collector was affirmed. The appellant endorsed the paper and, under all of the circumstances, was held to be in fact the lender. Decrees of trial courts to the same effect were upheld in Dixie Brokerage & Guaranty Co. v. Bailey, 212 Miss. 726, 55 So. 2d 438 (1951); Hays Finance Co. v. Bailey, 54 So. 2d 727 (Miss. 1951); Sinclair v. Bailey, 55 So. 2d 175 (Miss. 1951).

All of the foregoing factors and perhaps others arising in each case must be considered in order to determine the real, ultimate question, which is one of good faith, the factual relationships of the parties, and the facts of the transactions in issue. In most instances this would be primarily a question for the trial court. No one or more of these factors can be considered as resulting in a peremptory showing of bad faith and usury. The facts of each case in the light of these basic principles must determine the result.

## VI.

We find no error in the fact that the trial decree was rendered for the use and benefit of both the City and the State, since as previously discussed the state has an interest in the subject matter of the suit. Appellants also contend that the State Tax Collector has no power to sue for the penalty under the statute. The tax is levied by Code 1942, Section 9696-135. Section 9696-206 provides that if a person fails to obtain the license prior to commencing business "then such person shall be liable" for the tax plus 50 per cent penalty. It then gives the state tax collector the power to "proceed to collect such tax" from the person liable for it, and to bring such suits and to do all other things which might be necessary to collect. A reasonable and necessary implication from that statute is that the Legislature intended to give the state tax collector the power to collect both the tax and

the 50 per cent penalty. That in fact is what has been done in the earlier cited cases involving this statute.

The final decree rendered judgment aggregating $12,000.00 for the four years in question, which included 50 per cent damages, and awarded appellee 6 per cent interest on the amount of the taxes and damages from and after the dates when they became due and payable, the first day of each year for the years in question, 1949-1952. Appellee argues that Code Section 9696-228, when read along with Section 9822, dealing with the method of execution for payment of delinquent ad valorem taxes, evidences a legislative intent to apply interest from the date due to both the tax and the damages. ▆▆▆ However, provisions for damages and for interest prior to judgment must be strictly construed. In Gulf & S. I. R. Co. v. Laurel Oil & Fertilizer Co., 172 Miss. 630, 657, 158 So. 778 (1935), the suit was by a shipper for overcharges of freight, plus statutory damages. The trial court had allowed interest from the date of payment of the overcharge. It was held that the statute gave the party damages, but exclusive of interest until the date of the judgment; and that where a statute gives a specific remedy without saving as to other remedies, that remedy is intended to be exclusive. In accord is Fidelity & Deposit Co. v. Wilkinson County, 109 Miss. 879, 892, 69 So. 865 (1915). ▆▆▆ Hence interest should run on the judgment only from the date of the judgment, and to that extent the final decree is reversed in part and judgment is rendered here.

Appellants argue that the trial court was not justified in entering a judgment against appellant surety, the Employers Liability Assurance Corporation, Ltd., because the record does not contain a copy of the surety bond. After removal of this case to the Federal District Court, that court executed an order releasing the attachment defendants from the suit and adjudicating that GCC had filed a solvent surety bond in the penalty of

$12,000.00 for the discharge of the attachments in chancery. After the case was remanded to the chancery court, GCC filed a sworn answer stating that on September 9, 1952, it posted a solvent surety bond with the clerk of the U. S. District Court, and that on that day the bond was approved by the District Judge, who then released the attachment defendants. The final decree of the chancery court adjudicated that GCC had made and delivered a bond for the release of the attachments issued against those defendants, and had obtained said release of the impounded funds, and that "the said surety on said bond, Employers Liability Assurance Corporation, Ltd., has become and is liable herein for the full amount of said bond." It further adjudicated that "said bond having been officially approved," the attachment defendants were released from any further liability. Judgment was rendered against the appellant surety as well as GCC. ▮▮ ▮▮ The appeal bond was signed by both GCC and the appellant surety and recited that the latter was "surety on its attachment bond in this case." This was an admission by the appellant surety that it was on the bond, as adjudicated by the trial court.

Although a certified copy of the District Court's order discharging the attachments on the posting of a solvent surety bond was filed in the chancery court on October 27, 1952, the bond itself was not filed in that court. Appellants say: "True, such bond was posted in the federal court, while this case was there, but on its remand the bond was not refiled or offered in evidence in the trial of this case." Hence appellants argue that the trial court had nothing before it to support this decree against the surety on the attachment bond. But appellants admit in their brief that the bond was in fact made by appellant Employers Liability Assurance Corporation, Ltd., and that it was filed in the federal district court. And in the appeal bond herein they admit that appellant surety

was on the attachment bond. In view of these admissions appellants cannot complain of the defects in the record.

It is also urged that an affirmance of the chancery court's decree would be a violation of the interstate commerce clause of the United States Constitution, in that the evidence shows that the loans made here were by out-of-state corporations and consummated outside of Mississippi. However, there was ample evidence to support the finding in the decree that GCC and GCPC were loaning their own money in a purely intrastate, local activity in Mississippi. This was so held in Hays Finance Co. v. Bailey, 54 So. 2d 727 (Miss. 1951), in the opinion on suggestion of error in 56 So. 2d 76 (Miss. 1952). On appeal to the U. S. Supreme Court, in 343 U. S. 959, 72 S. C. 1057, that court sustained a motion to dismiss the appeal "for the want of a substantial federal question." See also Ibid. 56 So. 2d 806.

Affirmed in part, and in part reversed and judgment rendered.

*Roberds, P. J.,* and *Lee, Arrington* and *Lotterhos, JJ.,* concur.